FILED

## IN THE UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA 2017 MAY 15  AM 9: 52
### JACKSONVILLE DIVISION

**CREATIVE LEARNING CORPORATION,**

    **Plaintiff,**

**v.**                                                    Case No. 3:17-cv-552-J-34 PDB

**BLAKE FURLOW AND ANIK FURLOW,**

    **Defendants.**

_____/

## PLAINTIFF CREATIVE LEARNING CORPORATION'S COMPLAINT

Plaintiff Creative Learning Corporation ("CLC" or the "Company"), for its complaint against defendants Blake Furlow ("Blake") and Anik Furlow ("Anik" and, collectively, the "Furlows"), by and through its undersigned counsel, alleges, upon personal knowledge as to itself, and upon information and belief as to all other matters, the following:

### NATURE OF THE ACTION

1.    The Furlows have initiated a proxy contest in an effort to take control of the Board of Directors (the "Board") of CLC that violates the U. S. securities laws. In advancing their unlawful proxy fight, the Furlows have (a) violated the proxy rules including failing to comply with clear legal disclosure requirements surrounding their proxy attempt, and in so doing (b) appear to have not disclosed that they have aligned themselves with Brian Pappas ("Pappas"). Formerly the CEO of CLC, Pappas has wrought severe damage on CLC, and (i) is the subject of an intensive Securities and Exchange Commission ("SEC") investigation for securities laws violations, including fraud; (ii) engaged in misconduct that caused the SEC also to pursue CLC for the misconduct of Pappas and others, causing CLC to incur substantial expense and severe

business dislocations for an extended period of time; (iii) is the subject of a counterclaim and complaint brought by CLC that seeks redress for losses and expenditures caused by Pappas' fraud, conversion of company assets, and breaches of fiduciary duty that the Pappas perpetrated upon CLC; (iv) lodged an unsuccessful proxy challenge of his own in December 2016-February 2017 notwithstanding the pendency of the SEC investigation against him, which caused CLC to incur substantial expense and more dislocations; and (v) continued to violate U.S. securities laws during the course of that proxy contest leading the SEC to issue a letter requiring him to comply with proxy rules (with which letter Pappas does not appear to have complied either).

2.      The Furlows have themselves violated the federal law, *i.e.*, proxy rules, by soliciting their proxies through undisclosed group members, including apparently Pappas. To prevent shadow proxy contests controlled by undisclosed actors, Regulation 13D requires proxy solicitors to disclose **all** participants in a proxy campaign on their Schedule 13D/A filed with the SEC. In direct violation of this requirement, the Furlows have failed to disclose members of their proxy solicitation group (the "Undisclosed Group"). Upon information and belief, there are a very large group of shareholders outside of the Furlows and the Undisclosed Group. CLC's other stockholders, however, have no idea that the Undisclosed Group members are soliciting proxies as part of a proxy solicitation group with the Furlows.  Among other purposes, the rule is there to prevent proxy challenges that conceal the involvement of bad actors.

3.      Upon information and belief, Blake and at least some other members of the Undisclosed Group have an agreement or understanding with Pappas pursuant to which, if the Furlows and the Undisclosed Group are successful in taking control of the Board through their consent solicitation, they will cause CLC to settle on favorable terms to Pappas or withdraw CLC's complaint and counterclaim for fraud, conversion of company assets, and breaches of

2

fiduciary duty against Pappas. The Furlows have failed to disclose that agreement or understanding in his Schedule 13D/A, which is a material omission in violation of Rule 14a-9 and Rule 10b-5 under the Exchange Act.

4.     Moreover, Blake, who seeks to secure majority control of the CLC Board of Directors through his proxy solicitation, would be violating his fiduciary duties to CLC if he caused CLC to settle on favorable terms to Pappas or to withdraw CLC's claims against Pappas. The Company's claims against Pappas are serious and substantive, the damages that Pappas cause to CLC have been extensive and are ongoing, and Pappas' claim for a contract recovery against the Company is utterly spurious.

5.     The Furlows have, themselves, and through the Undisclosed Group Members, violated multiple proxy solicitation rules (the "Proxy Rules"). The Proxy Rules are meant to protect stockholders by ensuring they are in possession of timely, accurate and complete information from all parties to a contested director election. The Furlows have completely ignored these rules and, therefore, unfairly and irreparably has influenced the voting decisions of CLC's stockholders by, at a minimum:

a.     **Undisclosed Proxy Solicitation Materials:** The Furlows have solicited or will solicit proxies from stockholders in writing without disclosure of these written solicitations to the SEC, as required by SEC Rule 14a-6. CLC and its stockholders cannot quantify how many other violations of this type the Furlows committed because the Furlows refuse to follow the Proxy Rules.

b.     **Violation of "Less Than 10 Exemption":** The Furlows' Schedule 13D/A states that they intend to solicit proxies from ten or fewer shareholders, which would exempt them from compliance with the full panoply of proxy registration rules.

3

By failing to comply with the clear federal rule requiring them to properly disclose the individual shareholders in the Undisclosed Group, the Furlows have obstructed CLC and other shareholders from determining with clarity whether their group truly contains 10 or fewer shareholders and who may be dominating it. Upon information and belief, the Furlows and the Undisclosed Group have solicited more than 10 persons in connection with their consent solicitation, and if so, they have failed to file as required with the SEC and distribute to the stockholders of the Company a consent solicitation statement, in violation of Rule 14a-3 and Rule 14a-6 under the Exchange Act.

c.   **Undisclosed Agreements With Pappas:** In violation of the requirements of Items 6 and 7 of Schedule 13D/A, the Furlows failed to file as exhibits to their Schedule 13D/A: (i) the purchase agreement pursuant to which Blake purchased 500,000 shares on April 17, 2017, which Furlow's Schedule 13D does not disclose was a purchase from Pappas; and (ii) the agreement pursuant to which that gives Blake a right of first refusal to purchase all shares that Pappas owns and/or controls. Moreover, CLC has information indicating that Blake and/or others in the Undisclosed Group have additional agreements with Pappas in writing or otherwise as to steps they will cause the CLC Board to take if they take control, which steps would benefit Pappas and/or seriously underline the best interests of CLC.

6.   In light of the foregoing, CLC has been forced to bring this lawsuit seeking declaratory and injunctive relief: (1) mandating corrective disclosures by the Furlows, including full disclosure of all contracts, communications, arrangements, and understandings with Pappas;

(2) invalidating all proxies and votes that have been or will be solicited by the Furlows and their proxy solicitation group; and (3) restraining further violations of the federal securities laws, including the Proxy Rules. These remedies are necessary, in order to protect CLC's stockholders, the stockholder voting franchise, and the CLC from further irreparable harm.

## PARTIES

7.      Plaintiff CLC, formerly doing business as B2 Health, Inc., is a publicly-owned Delaware corporation authorized to transact business in Florida with its principal office in St. Augustine, Florida.  B2 Health, Inc. was incorporated in the State of Delaware on March 8, 2006. Thereafter, in March 2008, B2 Health, Inc. essentially abandoned its business plan. From the date of its incorporation through July 2010, B2 Health, Inc. generated only limited revenue, and had no significant operations. On July 7, 2010, in connection with the acquisition of BFK, B2 Health, Inc. changed its name to Creative Learning Corporation.

8.      Defendants Blake and Anik Furlow, who are related by marriage as husband and wife, are Idaho residents living at 2110 N. Westgate Drive, Boise, Idaho.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action based on 28 U.S.C. §§ 1331 and 2201, Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") 15 U.S.C. § 78aa, and Sections 13(d) and 14(a) of the Exchange Act, 15 U.S.C. §§ 78m(d), 78n(a) and the rules and regulations promulgated thereunder.

10.     Venue in this district is proper pursuant to 28 U.S.C. § 1391 and Section 27 of the Exchange Act 15 U.S.C. § 78aa, because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district, a substantial part of property that is the subject of this action is situated in this district, and/or the Furlows have transacted business in

this district.

11.     Declaratory relief is appropriate pursuant to 28 U.S.C. § 2201 because an actual controversy exists regarding the propriety of Furlows' statements and disclosures under the Exchange Act and the rules and regulations promulgated thereunder (collectively, the "SEC Rules").

## FACTUAL BACKGROUND

### The Furlows' Proxy Contest

12.     In or about February 2017, Blake initiated discussions with CLC in an effort to secure a seat on CLC's Board of Directors.

13.     Those discussions were on-going, productive, cooperative and cordial. In fact, during those discussions, Blake voiced support for the actions of the current board and voiced an interest in joining CLC's board to advance their work that Blake indicated that he fully supported. Blake also discussed the many issues (as disclosed publicly) that the company has faced arising out of Pappas' tenure.  Indeed, CLC recently had offered to enter into a nondisclosure agreement with Blake to enable CLC to share confidential information with Blake as a precursor to Blake joining the CLC board.

14.     During these discussions with Blake, Blake did not disclose to CLC that he (i) intended to initiate a proxy contest, (ii) had organized or been involved with a group of shareholders who sought to wrest control of the Company, and (iii) had entered into arrangements or agreements with former CLC CEO Pappas – who as detailed hereafter had engaged in serious U.S. securities law violations, tremendously injured CLC in a vast number of ways, and who previously had spearheaded another (failed) proxy contest during the course of which he engaged in other violations of securities laws.

15.     Nevertheless, in the midst of his discussions with CLC, Blake initiated the proxy contest at issue in this case, which reflect substantial proof that Blake had in fact entered into undisclosed arrangements with Pappas.

16.     On May 10, 2017, the Furlows filed with the SEC a Schedule 13D/A stating that they had delivered to CLC a written consent to remove two members of the existing board of directors (Messrs. Grant and Gorin); to amend the bylaws to permit shareholders to fix the size of the board; to fix the size of the board at five directors; and to elect three directors, Blake, Gary Herman, and Bart Mitchell, to fill the open Board seats.

17.     The filing further stated that the Furlows intend to solicit proxies from ten or fewer shareholders in connection with their written consent, and that the record date for their consent solicitation is fixed at May 10, 2017.

18.     CLC has myriad strong reasons to believe that Blake is acting in concert with Pappas in advancing the proxy contest, including without limitation:

     a.  Blake informed CLC that he had purchased 500,000 shares of stock in a private sale from Pappas.  This left Pappas with roughly 1.2M shares.

     b.  Significantly, instead of purchasing all of Pappas stock, Blake entered into a right of first refusal agreement for that stock. The Furlows' Schedule 13D/A explicitly discloses that Blake has entered into a contractual arrangement with Pappas, giving Blake a right of first refusal in the event that Pappas decides to sell his shares of CLC common stock. Therefore, Blake and Pappas have a legally documented ongoing arrangement.

     c.  The approach taken in the Furlows' Schedule 13D/A, namely, that they intend to solicit proxies from 10 or fewer shareholders, has the effect of confirming that

Blake is working with Pappas. Based upon the shareholder information available to CLC, the only way the Furlows can compile a combination of shareholders that would equal more than 50% of CLC's outstanding shares would be to include Pappas' 1.2M shares. It is therefore clear that the Furlows must have Pappas' substantial block of Company shares in order to gain control of CLC, meaning that *they have to work with Pappas to take control of CLC*.

d. As noted, a witness associated with the Undisclosed Group informed CLC that Blake suggested that CLC should resolve its claims with Pappas by paying Pappas notwithstanding the groundlessness of Pappas' claim and the massive proof of Pappas' fraud and other misconduct against the company.

e. The same law firm that represented Pappas in connection with his failed effort to oust and replace the current CLC Board of Directors is now representing the Furlows in their similar effort to oust and replace a majority of the CLC Board of Directors.

19. The many legal flaws and rule violations of the Furlows' proxy challenge that conceal who is involved with their effort to take control of the Company are themselves disturbing and must be addressed. Moreover, the fact that they appear to conceal the involvement and participation of an individual of the stripe of Pappas in this latest proxy challenge typifies the reason that the rules were promulgated in the first place: shareholders must be informed if there are individuals who they would wish to avoid lurking behind efforts to take-over a public company.

20. We now turn to a more detailed explanation of the reason CLC has such concern about the involvement of Brian Pappas in this proxy contest.

## Brian Pappas' Role at CLC, BFK, and FranVentures, and
## the Extensive Harm Pappas Caused to CLC.

21.     In the spring of 2009, Pappas met with Michelle Cote, the founder of Bricks 4

Kidz®, and together they formed BFK Franchise Company, LLC ("BFK") in May 2009.

22.     FranVentures d/b/a Franchise Ventures is a Florida limited liability company with

its principal office at Pappas' residence in St. Augustine, Florida. At all relevant times, Pappas

has controlled FranVentures and has been owner and Managing Director of FranVentures.

23.     Through FranVentures, Pappas was the managing member of BFK.

24.     On July 2, 2010, pursuant to a Stock Purchase Agreement ("SPA"), CLC acquired

BFK from BFK's members for 9 million shares of CLC's common stock.

25.     Pappas was paid handsomely for his membership interest in BFK. In return for

FranVentures's membership interest in BFK, the SPA provided that Pappas via FranVentures

received 2,599,000 shares of CLC common stock, which at the time equaled 26.5% of CLC's

outstanding shares.

26.     On July 2, 2010, as a result of the transaction, CLC replaced FranVentures as

managing member of BFK. As a result of CLC's acquisition of BFK: (a) BFK became a 100%-

owned subsidiary of CLC; (b) CLC became the sole member of BFK; and (c) FranVentures

ceased to be a member at all – managing or otherwise – of BFK. Accordingly, as of CLC's

acquisition of BFK, CLC became managing member of BFK, replacing FV as managing

member.

27.     Pappas became the CEO and a director of BFK's parent company, CLC, when

CLC acquired BFK in 2010. Thereafter, Pappas had actual domination and control over the

Board members of CLC in connection with the operations and management of CLC.

28.     In April 2015, the SEC issued a subpoena to CLC seeking without limitation materials regarding Pappas, certain members of Pappas' family, other company employees, board members and third-parties, company books and accounting procedures as well as other material regarding company affairs.

29.     In or about that time, it came to the attention of CLC that the SEC had initiated an investigation into possible violations of the securities laws by the Company and/or its officers, directors and/or others as of at least January 14, 2014.

30.     To begin to address issues the SEC had raised, in late April 2015, CLC's Board elected two new independent directors, and created an Audit Committee, which included the two new directors. In addition, on July 22, 2015, the Board of Directors of CLC removed Pappas as CEO.

31.     On January 23, 2016, Pappas resigned from the CLC Board of Directors.

### The CLC-Pappas Litigation

32.     On March 7, 2016, FranVentures brought a state-court lawsuit against CLC and BFK alleging breach of contract and seeking a declaratory judgment.

33.     On June 23, 2016, CLC filed a counterclaim against FranVentures, which included a complaint against Pappas and also named his wife, Christine Pappas, as a defendant. CLC's counterclaims seeks redress for losses and expenditures caused by fraud, conversion of company assets, and breaches of fiduciary duty that Pappas perpetrated upon CLC while serving as the CEO of CLC and a member of its Board of Directors:

a.      Pappas defrauded CLC, converted company assets and breached his fiduciary duty of loyalty by causing CLC to pay his company, FranVentures, more than $1,000,000 by falsely asserting that the funds were due under a contractual

10

provision that Pappas knew had expired when CLC acquired BFK ("BFK"). After CLC stopped payments to FV in October 2015, Pappas sued CLC, claiming that CLC had to pay FV under that contract *in perpetuity* – that is, Pappas took the position that CLC *never* could stop paying his company – even though he knew that there was no legal basis for his claims.

b.   To conceal the foregoing fraud scheme, Pappas made and caused to be made material false statements and material omissions regarding the transaction to CLC independent directors as well as in CLC's filings with the SEC.

c.   Pappas breached his fiduciary duty of loyalty to CLC by repeatedly engaging in self-dealing and causing CLC to enter into several transactions with, and to make payments to or on behalf of, several members of his family, including his wife and brother, which transactions and payments were not disclosed to or approved by CLC's board of directors and were not in the best interests of CLC and its shareholders.

d.   Pappas breached his fiduciary duty of loyalty to CLC by causing CLC to expend hundreds of thousands of dollars to respond to an investigation of Pappas and the Company the SEC initiated in early 2015 while Pappas was CLC's CEO and Chairman of the Board as a result of Pappas' misconduct detailed above.

e.   Pappas breached his fiduciary duty of loyalty to CLC by causing CLC liability for restitution and rescission payments, as well as state penalties and costs, in connection with an investigation conducted by the State of Virginia, alleging that Pappas committed fraud in relation to sales of Challenge Island franchises in

Virginia, and that he thereafter caused an attempt to cover-up this fraud by taking further illegal actions.  CLC has since divested itself of Challenge Island.

f.    Pappas breached his fiduciary duty of loyalty to CLC by failing to implement adequate internal financial and corporate controls, thereby concealing his other misconduct and permitting Pappas to control and dominate CLC, misappropriate the Company's assets, and repeatedly engage in fraud and self-dealing to the detriment of the Company and its shareholders.

g.    Pappas' misconduct described above was a material cause of the substantial delay and difficulty of the Company's independent auditors in performing the audit of the Company's financial statements for the 2015 fiscal year, which required the Company to suspend its domestic franchise sales on February 1, 2016 continuing for many months thereafter, causing financial loss to the Company.

34.    The misconduct outlined in CLC's complaint against Pappas was terminated only after Pappas was forced to admit new independent directors to CLC's board, was replaced as CLC's CEO, and was terminated as a CLC employee.  The misconduct caused CLC great expense and dislocation, from which CLC is only now recovering.

35.    In addition to the SEC investigation and its litigation with Pappas, Pappas's misconduct has caused CLC has to expend substantial resources defending suits third parties have brought arising out of or related to Pappas' actions and omissions:

a.    Pappas caused CLC to engage in improper practices in the State of Virginia in violation that state's law, which the Company was only able to resolve in early 2016 (after Pappas' departure) at material expense, including penalties to the state of Virginia;

b. Pappas engaged in conduct toward CLC's former Chief Financial Officer that led to another lawsuit for defamation, which CLC has only very recently been able to resolve, again at material expense;

c. During the course of the time following Pappas' departure from CLC, CLC has been confronted with numerous disputes from franchisees alleging contract breaches and fraud by Pappas, which matters have repeatedly caused CLC to incur material expense. For example, on October 7, 2016, a franchisee filed a demand for arbitration against BFK alleging that BFK had engaged in contract breaches and fraud in relation to numerous franchise agreements signed by Pappas (or Dan O'Donnell, VP Operations) between September 22, 2012 and November 1, 2015.

**The SEC-CLC Preliminary Settlement Proposal**

36. On January 8, 2017, CLC accepted a preliminary settlement proposal offered by the staff of the Enforcement Division of the SEC. As is standard in these situations, the SEC staff made clear that the proposal is not final and is subject to and contingent upon approval by the leadership of the SEC Enforcement Division and the Securities and Exchange Commission itself.

37. If the proposed settlement is approved by the Commission, the SEC would: (1) impose no financial penalty against CLC and not order an internal monitor at the Company; and (2) make findings that CLC committed a series of federal securities law violations, all of which occurred during the time that Pappas was CLC's CEO and Chairman of the Board and which in most instances pertain to specific actions taken by and/or for the personal benefit of Pappas.

38. The violations the SEC identified include: Pappas' communication of material inside information to select shareholders; improper loans to or for the benefit of Company

officers, including a loan to a company associated with Pappas; false statements in SEC filings in 2015 related to the fiscal year ended 2014; failure to disclose related party transactions; and failure to establish and conduct company affairs with proper internal controls over financial reporting.

39.     Other elements of the settlement proposal include: each of the Company's current audit committee members would certify that the Company has instituted various remedial measures; and the Company would retain an independent consultant (subject to the review and approval of the SEC staff) to review and verify that the foregoing remedial measures have been instituted.

40.     CLC continues to work with the SEC Staff toward finalizing the settlement.

### Pappas's Unsuccessful Proxy Contest

41.     On December 9, 2016, Pappas, through FranVentures, initiated a proxy contest by filing with the SEC a preliminary consent statement on Schedule 14A asking the shareholders of the Company to remove the current members of the Board of Directors and to replace them with three individuals proposed by Pappas.

42.     In connection with Pappas's proxy solicitation, by a letter dated January 31, 2017, the SEC informed Pappas that he improperly had engaged in improper, undisclosed solicitations:

> We understand that you have engaged in communications with shareholders of the company and such communications would appear to constitute solicitations within the meaning of Rule 14a-1(l). We remind you that all written soliciting materials must be filed under the cover of Schedule 14A. See Rule 14a-6(b). We further remind you that all written instructions, scripts or other materials that discuss, review or comment on the merits of any matter to be acted on, that are furnished to persons making the actual solicitation for their use directly or indirectly in connection with the solicitation, whether the persons making the solicitation are third-party solicitors or the participants themselves, must be filed under the cover of Schedule 14A. See Rule 14a-6(c)

43.    Despite the SEC's letter, Pappas never filed any of the written solicitations under 14A as the SEC required.

44.    CLC announced on February 9, 2017 that the proxy contest of Pappas and FranVentures had failed and that there would be no change in CLC's Board of Directors.

## STATEMENT OF CLAIMS

45.    It is highly-disturbing that the Furlows appear to be acting in concert with Pappas because any Pappas involvement – direct or indirect – in CLC's affairs is not in the best interests of the Company's stockholders. The Furlows are aligning themselves with a stockholder who defrauded CLC, and whose leadership brought an SEC investigation of CLC and Pappas), which investigation is ongoing. If elected, the Furlows' candidates would control the Board and, although they would be subject to their fiduciary duties under Delaware law, they would be in a position to advance Pappas' specific interests, which are not aligned with the interests of all of CLC's stockholders.

46.    If the Furlows are acting in concert with Pappas and succeed in their attempt to gain control of CLC through their consent solicitation:

a.    The Furlows' Board candidates may agree to pay Pappas the undeserved commissions that he seeks in his lawsuit against CLC and to withdraw CLC lawsuit against him in order to protect him from potential liability to CLC. As a result, the CLC may not be able to recover the substantial damages caused by Pappas' conduct and those damages, instead, will be borne by the CLC.

b.    There is a significant risk that Pappas may again engage in the conduct described above (and/or attempt to encourage his director candidates to engage in such conduct), thereby causing further financial and reputational losses to the

15

Company.

c.  The new Board members would not be in a position to implement a key element
of the SEC settlement proposal – *i.e.*, that each of the CLC's current audit
committee members certify that CLC has instituted various remedial measures
intended, *inter alia*, to address Pappas' prior misconduct.

47.  Accordingly, it is critical that the Furlows make full and complete disclosure of
all communications, solicitations, contacts, contracts, and other arrangements with Pappas.

48.  As explained below, the securities laws and regulations require such disclosures.
Indeed, the Section 14 of the Securities Exchange Act of 1934 is designed to prevent persons
such as the Furlows from obtaining authorization from corporate action by means of deceptive or
inadequate disclosure in the proxy solicitation. By enacting Section 14(a), Congress intended to
provide the opportunity for fair corporate suffrage for shareholders of every equity security
bought on a public exchange.

### The Furlows have unlawfully concealed the complete membership of their proxy solicitation group from CLC and the investing public

49.  Under SEC Rule 13d-1, a person who acquires "beneficial ownership" of more
than 5% of a class of stock must file a Schedule 13D/A or similar public disclosure. And, under
SEC Rule 13d-5, when "two or more persons agree to act together for the purpose of acquiring,
holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be
deemed to have acquired beneficial ownership." Where such a group is formed, SEC Rule 13d-1
obligates the members of the group to file either: (1) a joint Schedule 13D/A on behalf of the
entire group; or (2) separate Schedule 13D/As on behalf of each individual group member. If the
members of the group decide to file separate Schedule 13D/As, SEC Rule 13d-1 requires "each
such filing [to] identify all members of the group."

16

50.     The Furlows did not identify their membership in any such beneficial ownership group in their Schedule 13D/A, and have failed to update his Schedule 13D/A to indicate any agreement to join such a group.

51.     Despite the foregoing, CLC has learned that Blake has formed an undisclosed beneficial ownership group with a group of CLC stockholders. In multiple communications with a representative of CLC, Blake has stated that he has been serving a conduit for such a group and cannot reach any agreements with CLC without that group's consent. Another stockholder of CLC with close connections to the Undisclosed Group also has informed CLC about the existence of such a group.

52.     The necessity for such disclosure is particularly important here because of the various indications that Pappas is directly or indirectly a part of this group.

53.     It is thus clear that this group has agreed, in the words of Rule 13d-5, to "act together" with CLC "for the purpose of...voting" CLC stock. Yet neither Blake nor any members of the group have disclosed this arrangement in a Schedule 13D/A, depriving CLC and its stockholders of fair context to evaluate the proxy contest being waged by this group.

54.     The Furlows' failure to identify his involvement with any ownership group in his Schedule 13D/A violates SEC Rule 13d-1.

**Despite failing to disclose its group relationship with the Undisclosed Group, the Furlows have used or will use that group as a conduit for undisclosed, covert proxy solicitations in violation of SEC Rule 14a-6**

37. Section 14(a) of the Exchange Act and SEC Rule 14a-6 require all persons soliciting proxies to file with the SEC "all [] soliciting materials, in the same form as the materials [were] sent to security holders." This rule ensures that proxy contests are conducted in the light of day, subject to the SEC rules and regulations that ensure a fair and open competition for board

representation.

38. However, in an apparent effort to gain an unfair advantage through unregulated proxy solicitations, Furlow has used or will use the Undisclosed Group as a covert conduit for the distribution of its proxy solicitation materials in support of the board takeover he seeks to effectuate.

39. In fact, the Furlows already have disclosed that they have a right of first refusal agreement with Pappas, which conclusively indicates that the Furlows have set the stage of continued dealings with Pappas, and further indicates that the Furlows have or will be communicating with Pappas either to solicit his consent or to acquire his shares of CLC common stock.

42. In violation of Section 14(a), none of these solicitations have been filed with the SEC.

### The Furlows' proxy materials are materially misleading in violation of SEC Rule 14a-9

45. SEC Rule 14a-9(a) provides, among other things, that no solicitation:

...shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

55. As noted, it appears that Blake has entered into an agreement or understanding with Pappas that would not only discharge Pappas from his wrongdoing and the substantial harm he visited upon CLC, but would pay him on a groundless claim to boot.

56. The Furlows have failed to disclose that agreement or understanding in his Schedule 13D/A, which is a material omission in violation of Rule 14a-9 and Rule 10b-5 under

the Exchange Act.

**The Furlows fail to satisfy the "less than 10" exemption set forth in Rule 14a-2(b)(2)**

57.     Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a),

provides that one violates federal securities laws by using the mails or an instrumentality of

interstate commerce to "solicit or to permit the use of his name to solicit any proxy or consent or

authorization" regarding a security registered as required by law "in contravention of such rules

and regulations as the Commission may prescribe." An exemption to the proxy registration rules

is found in Rule 14a–2(b)(2), which permits a person to solicit stockholders without having to

comply with the full panoply of proxy registration rules "where the total number of persons

solicited is not more than ten."

58.     Furthermore, the SEC has stated that "[a]n insurgent intending to engage or

engaging in a solicitation of no more than 10 persons under Rule 14a-2(b)(2) should remain

mindful that its filing and dissemination of a Schedule 13D – depending on the content of this

document and other relevant facts and circumstances – may be deemed to constitute a more

widespread 'general' solicitation that may preclude reliance upon Rule 14a-2(b)(2). SEC

Division of Corporation Finance, MANUAL OF PUBLICLY AVAILABLE TELEPHONE

INTERPRETATIONS, § N, ¶ 4.2.

59.     While the Furlows' Schedule 13D/A states that they intend to solicit proxies from

ten or fewer shareholders, upon information and belief, the Furlows and the Undisclosed Group

have solicited more than 10 persons in connection with their consent solicitation. CLC has

reason to believe that the Furlows may well intend to improperly consolidate under the name of

single shareholders the holdings of various distinct shareholders and in that way cobble together

a group of 10.

60.    In violation of Rule 14a-3 and Rule 14a-6 under the Exchange Act, the Furlows

failed to file with the SEC and distribute to the stockholders of the Company a consent

solicitation statement.

### In violation of the requirements of Items 6 and 7 of Schedule 13D, the Furlows failed to disclose all agreements and to file exhibits to their Schedule 13D/A

61.    Under sections 13(d) and 23 of the Securities Exchange Act of 1934 and the rules

and regulations thereunder, the SEC is authorized to solicit the information required to be

supplied by Schedule 13D. Disclosure of the information specified in this schedule is mandatory.

62.    Schedule 13D, Item 6, entitled Contracts, Arrangements, Understandings or

Relationships With Respect to Securities of the Issuer, requires the filer to describe any

contracts, arrangements, understandings or relationships (legal or otherwise) between the filer

and any person with respect to any securities of the issuer, including but not limited to transfer or

voting of any of the securities, finder's fees, joint ventures, loan or option arrangements, puts or

calls, guarantees of profits, division of profits or loss, or the giving or withholding of proxies,

naming the persons with whom such contracts, arrangements, understandings or relationships

have been entered into. This disclosure must include such information for any of the securities

that are pledged or otherwise subject to a contingency the occurrence of which would give

another person voting power or investment power over such securities except that disclosure of

standard default and similar provisions contained in loan agreements need not be included.

63.    Under Schedule 13D, Item 7, entitled Material to be Filed as Exhibits, the SEC

requires the filing as exhibits of, *inter alia*, copies of all written agreements, contracts,

arrangements, understanding, plans or proposals relating to: (1) the borrowing of funds to

finance the acquisition as disclosed in Item 3 (Source and Amount of Funds or Other

Consideration); (2) the acquisition of issuer control, liquidation, sale of assets, merger, or change

in business or corporate structure, or any other matter as disclosed in Item 4 (Purpose of Transaction); and (3) the transfer or voting of the securities, finder's fees, joint ventures, options, puts, calls, guarantees of loans, guarantees against loss or of profit, or the giving or withholding of any proxy as disclosed in Item 6.

64.     The Furlows have contravened the requirements of Items 6 and 7 by failing to disclose material information regarding their contractual arrangements with Pappas, their relationship with Pappas, and any promises they have made to Pappas, including any promise to cause CLC to settle its litigation with Pappas on favorable terms to Pappas.

65.     The Furlows failed to file describe and file as an exhibit to their Schedule 13D/A the purchase agreement pursuant to which Furlow purchased 500,000 shares on April 17, 2017. In Item 3 of their Schedule 13D/A, the Furlows state that "they entered into a purchase agreement for 500,000 shares of Common Stock through one private party transaction of April 17, 2017. But the Furlows do not, as they must, describe this "purchase agreement" in Item 6, or file it as an exhibit in accordance with Item 7. These omissions are particularly material because, upon information and belief, the Furlows entered into this "purchase agreement" with Pappas.

66.     The foregoing would amount to an intentional effort to conceal the Furlows' more expansive involvement with Pappas.

67.     The Furlows also did not file as an exhibit to their Schedule 13D/A the agreement pursuant to which Blake has a right of first refusal to purchase all shares that Pappas owns and/or controls. In Item 6, the Furlows state that Blake "has a right of first refusal to purchase all shares beneficially owned by Brian Pappas and FranVentures at which time Seller decides to sell." Even though this "right of first refusal" agreement with Pappas plainly is a "written agreement[], contract[], arrangement[], understanding, plan[] or proposal[] relating to...the acquisition of

issuer control, ...change in business or corporate structure, or any other matter as disclosed in Item 4," the Furlows' falsely state that Item 7 is "Not applicable."

68.     The Furlows efforts to conceal their agreements – written and oral, formal or informal – with Pappas should not be countenanced. All such agreements must be disclosed.

## COUNT I
### Declaratory Judgment

69.     CLC incorporates by reference the allegations set forth in each preceding paragraph hereof as if fully set forth herein.

70.     There exists a justiciable controversy between CLC and the Furlows regarding the lawfulness of their SEC disclosures and their solicitation of proxies.

71.     In violation of Section 13(d) of the Exchange Act and SEC Rules 13d-1, 13d-2, and 13d-5, the Furlows' Schedule 13D/A contains no disclosure—and has not been updated to contain any disclosure—of the: (a) groups of persons and entities acting together with the Furlows for the purpose of acquiring, holding, voting, or disposing of CLC's stock; or (b) the terms and nature of the relationship between CLC and the other members of the groups of persons and entities acting together with CLC for the purpose of acquiring, holding, voting, or disposing of CLC stock.

72.     As described above, in their Schedule 13D/A, the Furlows have made misleading misstatements and omissions of material facts in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9. The materially misleading misstatements and omissions made in the Furlows' SEC filing were made with at least the negligent state of mind required under Section 14(a) of the Exchange Act and SEC Rule 14a-9.

73.     As described above, the Furlows have made or will make proxy solicitations that, in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-6, have not been filed with

22

the SEC and do not contain legally required explanatory information.

74.     As alleged above, the Furlows have failed to satisfy the "less than 10" exemption

and in violation of Rule 14a-3 and Rule 14a-6 under the Exchange Act, the Furlows failed to file

with the SEC and distribute to the stockholders of the Company a consent solicitation statement.

75.     In violation of the requirements of Items 6 and 7 of Schedule 13D, the Furlows

also failed to disclose all agreements and to file exhibits to their Schedule 13D/A

76.     Defendants' unlawful disclosures and omissions, group formations, and proxy

solicitations have deprived CLC's stockholders of their right to make decisions about the future

of the Company based on full and accurate information and, without action by this Court, are

likely to distort the outcome of the Furlows' proxy contest.

77.     This result would irreparably injure the Company by depriving it of the leadership

it would have obtained as a result of a lawful proxy voting process.

78.     CLC has no adequate remedy at law.

79.     Accordingly, CLC is entitled to, and requests, a declaratory judgment, *inter alia,*

that: (a) the Furlows have unlawfully concealed the complete membership of their proxy

solicitation group from CLC and the investing public in violation of SEC Rule 13d-1; (b) despite

failing to disclose its group relationship with the Undisclosed Group, the Furlows have used or

will use that group as a conduit for undisclosed, covert proxy solicitations in violation of Section

14(a) of the Exchange Act and SEC Rules 14a-9 and 14a-6; (c) the Furlows' proxy materials are

materially misleading in violation of SEC Rule 14a-9 insofar as these materials, inter alia, fail to

disclose the full nature and extent of their agreements and arrangements with Pappas; (d) the

Furlows fail to satisfy the "less than 10" exemption set forth in Rule 14a-2(b)(2); (e) in violation

of the requirements of Items 6 and 7 of Schedule 13D, the Furlows failed to disclose all

agreements and to file exhibits to their Schedule 13D/A; and (f) all proxies and votes solicited in favor of the Dissident Candidates are null and void due to Defendants' violations of the Exchange Act.

## COUNT II
### Additional Injunctive and Other Relief

80.     CLC incorporates by reference the allegations set forth in each preceding paragraph hereof as if fully set forth herein.

81.     The Furlows' unlawful disclosures and omissions, group formations, and proxy solicitations have deprived CLC's stockholders of their right to make decisions about the future of the Company based on full and accurate information and, without action by this Court, are likely to distort the outcome of the Furlows' proxy contest.

82.     This result would irreparably injure the CLC by depriving it of the leadership it would have obtained as a result of a lawful proxy voting process.

83.     CLC has no adequate remedy at law.

84.     Accordingly, CLC is entitled to, and requests, preliminary and permanent injunctive relief ordering the Furlows to, *inter alia*: (a) issue an amended Schedule 13D in full compliance with Regulation 13D and all applicable rules, disclosing all members of its beneficial ownership group or groups; (b) make full and complete disclosure and production of all communications, solicitations, contacts, contracts, and other arrangements with Pappas and others; (c) make a full disclosure of all proxy solicitations; and (d) file additional proxy solicitation materials with the SEC acknowledging the unlawfulness of the Furlows' prior violations of the proxy solicitation rules and correcting all prior misstatements made in prior proxy solicitation materials.

## PRAYER FOR RELIEF

WHEREFORE, CLC seeks a judgment: (1) granting the declaratory relief described above; (2) issuing the preliminary and permanent injunctive relief described above; (3) awarding CLC the costs and disbursements of this action, including reasonable attorneys' fees; and (4) granting CLC such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Kevin E. Hyde
FL Bar No. 0768235
khyde@foley.com
Leonard V. Feigel
FL Bar No. 27752
LFeigel@foley.com
Foley & Lardner LLP
One Independent Drive, Suite 1300
Jacksonville, FL 32202-5017
Telephone:  904.359.2000
Facsimile:  904.359.8700

Scott Mendeloff (pro hac vice pending)
mendeloffs@gtlaw.com
Gabriel Aizenberg (pro hac vice pending)
aizenbergg@gtlaw.com
Greenberg Traurig, LLP
77 West Wacker Drive
Chicago, IL 60601
312-456-1083